## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

73716
**(Inmate Number)**

Equan Anwar Jones
**(Name of Plaintiff)**

Dauphin County Prison, 501 Mall Road
**(Address of Plaintiff)**

Harrisburg, Pennsylvania 17111

**vs.**

Herbert August[1], John Beitman[2], Steve Smith[3],
Dominick Derose[4], Tim Good[5], Jill Cuffaro[6],
Elizabeth A. Nichols[7] (individually & in their
**(Names of Defendants)**   official capacities)
Dani mariconda[8]

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

3:12-CV-1961
**(Case Number)**

**COMPLAINT**

**FILED
SCRANTON**

OCT 01 2012

PER _____
DEPUTY CLERK

**TO BE FILED UNDER:** ✓ 42 U.S.C. § 1983 - STATE OFFICIALS

_____ 28 U.S.C. § 1331 - FEDERAL OFFICIALS

**I.  Previous Lawsuits**

**A.**  If you have filed any other lawsuits in federal court while a prisoner please list the caption and case number including year, as well as the name of the judicial officer to whom it was assigned:

Equan Anwar Jones V. The City of Philadelphia (Prison Overcrowding Cases) Civil Action

No. 11-3711 And all member cases. I was included on case in 2010 Judicial Officer

Unknown, Jones V. Derose et al.; Civil Action No. 3:12-CV-570 I filed in

March of 2012 and have not yet been assigned a Judicial Officer

**II.  Exhaustion of Administrative Remedies**

**A.**  Is there a grievance procedure available at your institution?
✓ Yes _____ No

**B.**  Have you filed a grievance concerning the facts relating to this complaint?
✓ Yes _____ No

If your answer is no, explain why not _____

_____

**C.**  Is the grievance process completed? ✓ Yes ~~No~~

1.

## I. Jurisdiction & Venue

1. This is a civil action authorized by 42 U.S.C. Section 1983 to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States. The court has jurisdiction under 28 U.S.C. Section 1331 & 1343 (a) (3). " Plaintiff seeks declaratory relief pursuant to 28 U.S.C. Section 2201 & 2202." "Plaintiff's claims for injunctive relief are authorized by 28 U.S.C. Section 2283 & 2284 & Rule 65 of the Federal Rules of Procedure." * The court has supplemental jurisdiction over plaintiff's state law claims under 28 U.S.C. Section 1367."

2. The Middle District of Pennsylvania is an appropriate venue under 28 U.S.C. Section 1391 (b)(2) because it is where the events giving rise to this claim occured.

## II. Plaintiffs

3. Plaintiff, Equan Anwave Jones, is and was @ all times mentioned herein a prisoner of the City of Harrisburg in the State of Pennsylvania. He is currently confined in the Dauphin County Prison in Harrisburg, Pennsylvania.

## III. Defendants

4. Defendant, Herbert Ruquet is a Correctional Officer of the Dauphin County Prison who, @ all times mentioned in this complaint held the rank of Correctional Officer @ the Dauphin County Prison

5. Defendant, John Beitman is a Correctional Officer of the Dauphin County Prison who, @ all times mentioned in this complaint held the rank of Correctional Officer @ the Dauphin County Prison

6. Defendant, Dominick Deoose is the Warden of Dauphin County Prison. He is legally responsible for the operation of Dauphin County Prison and for the welfare of all the inmates in that prison.

2

Defendant, Tim Gyxel is a Lieutenant and Policy Compliance officer and "upon knowledge & belief" sometimes acting Major her duty calls for of the Dauphin County Prison who @ all times mentioned in this complaint held the rank + Lieutenant & Policy Compliance officer of the Dauphin County Prison.

Defendant, Steve Smith is a Lieutenant of the Dauphin County Prison who,@ all times mentioned in this complaint held e rank of Lieutenant of the Dauphin County Prison.

Defendant, Elizabeth A. Nichols is the Deputy Warden of Treatment of Dauphin County Prison. She is responsible n overseeing the placement of all inmates throughout the prison and oversees all Treatment Staff, who @ all mes in this complaint held the rank of Deputy Warden of Treatment of Dauphin County Prison.

, Defendant, Jill Cuffaro is the Caseworker for P.Block of Dauphin County Prison. She is responsible for all interactions bet een inmates & Administration, inmates & attorneys by telephone, parole plans, who @ all times mentioned in this implant held the title of Caseworker of P.Block for Dauphin County Prison.

, Each defendant is sued individually & in his/her official capacity. At all times mentioned in this complaint each efendant acted under the color of state law.

## IV Facts

2 I am placing this incident first because it was the beginning of Ofc. Ruquet's behavior which was from the start one plainly in front of Ofc. John Beitman. Sometime within my first week on the block "NY" (Ofc. Ruquet's Aka) pened my cell. My cellie was asleep so I walked up front and asked him "Did you want me?" he responded by say-ig "In more ways than one." I don't know what Beitman said to him but Ruquet responded with "No, i'm just oing to watch these skinny black guys." Myself and another inmate were showering and Ruquet took a chair and sat rit tly behind us. That should be on camera.

_3_

12. 11.15.11 - An inmate from 12 cell asked me to ask C.O. N.Y. to come to his cell. N.Y. after a few minutes came down the tier and conversed with me about not knowing who called him. I told him what cell & he went to him. After he was done he walked to me & in a low tone said "Thanks for tellin' me what cell, you shoulda come over, we could've made it a threesome." I responded by tellin' him "I don't appreciate you talkin' to me like that, I don't get down like that." He laughed & walked away.

13. 11.16.11 - I get called out by Ofc. Beitman to run @ around 2:00 pm. Myself & inmate Michael Gilmore (cell 122) start to clean. I asked "N.Y." could I move the chairs to either sweep or mop & his response was "you can slide it all over the floor if you want." Gilmore & I looked @ eachother & he shook his head. I can't recall the next remark but Gilmore then said "you keep leaving yourself open for it. You gotta watch what you say to dude." I basically steered clear of N.Y. until after dinner when we needed a few bags.

14. Now after rec & we locked in, Gilmore & I come back out to once again sweep, mop & scrub the showers. I was informed by Gilmore that N.Y. said when I was done mopping I could take a shower. Before I got in the shower I asked Beitman would he use me to run again & had I done a good job. He said "You did a helluva job." N.Y. said "sure you can run again, all you gotta do is get in the shower butt naked."

15. I looked @ Ofc. Beitman & non-chalantly shook his head. I returned the mop & bucket to the corner & started to walk back toward my cell when I heard Ofc. Beitman ask N.Y. "what are you doing under there?" N.Y. replied "this so I don't get wet while I'm scrubbing Jones' back." N.Y. had his coat over his head which should be clearly visible on camera.

16. I immediately went to my cell & informed my cellie Shondell Bapster of my uncomfortability with N.Y. & the things he saying to me, & that I was going to shower with my thermal pants on which I did. I walked up the side of the tier with cells 1-15 & got into the shower. As soon as I got in N.Y. walked past & once again made reference to "scrubbing Jones' back while I'm @ it."

17. Now while Gilmore & I had first come out to run, there was a phone call from up front about inmate Aponte's phone

4

de not working . Ofc. Beitman opened cell 14 & started calling for Aponte. The inmate in 14 cell was trying to inform Beitman he had the wrong cell. Beitman in a sarcastic tone started speaking spanish telling Aponte to come out. When he looked @ Gilmore & I & said "If I moved to Mexico, you better damn well know I'm gonna learn Spanish & if I moved to Germany the same!"

. Then when Gilmore got all the soap off the floor in the shower, Beitman asked "where did most of the soap come from?" He responded by saying the shower opposite the one I used & he said "oh yeah, that's the one all the Puerto Ricans use, we guys just don't care."

11·18·11 - Ruquet came to question my cellie about his footwear situation. When he walked into the cell he looked @ me & said "Ooon, look @ you." then he rubbed my left arm, I snatched my arm back & said "look @ what?" That's when my cellie got up & Ruquet commenced to asking him about his footwear situation.

·11·22·11 - When I came back from court Ofc. martinez come to me because he received my request to go to P.C. I told him I wasn't sure but then I was cool, I figured I would be moved to K·Block that night so I wouldn't be around Ruquet. But after I ate I was even more uncomfortable & uneasy so I said I still wanted to be moved. Martinez brought me a new request slip because they got rid of the old one.

. In a few minutes Ofc. Ruquet walked into my cell & I immediately felt threatened. He walked toward me & asked me what was the problem. I backed up & leaned on the desk & said "nuthin." He said "noone is bothering you are they?" He then said "it's not like i'm gonna strip you butt naked & rape you, although I would do it willingly." As he said this his hand was on his genitals. I said "i'm good." I didn't wanna be alone with him any longer than I had to. He then said "don't do the wrong thing." looked @ me & walked out.

L. I have days & information recorded from 11·22·11 - 7·3·12 of all progress & activity that has taken place since day one. I have recorded & placed with this complaint as exhibits, my original grievances & original decisions & my original appeals. Along with my letter to the D.A.'s office after Det. Wallborn from CID told me he only saw a crime of harassment in a summary offense

5

I would have to had to had been in a relationship with either Beitman or Ruquet. The crime of harassment was also a misdemeanor.

23. I knew I had a problem when I spoke to Lt. Steve Smith & he referred to Ruquet as "Herbie". He told me he was only addressing the problem so I couldn't say "Lt. Smith didn't do anything." Then he asked me what I wanted done & I said that I wanted Ruquet & Beitman held accountable. I have not spoken to Lt. Smith since 12·18·11. I got his decision & appealed it 12·26·11 & filed a grievance on him on 2·2·12 for his conduct & negligence in conducting a thorough investigation. From day one there was not a genuine interest from one official in this building to find out the truth pertaining to this matter.

24. I have proof that I did not have to wait to file my lawsuit because yes, under the PLRA prisoners must exhaust all administrative remedies when dealing with conditions of confinement, but sexual harassment & sexual assault are not conditions of confinement. I have done as much as I have attempting to give Dauphin County Prison a chance to right this wrong but all I have gotten in return are denials.

25. The only type of counseling or help I've received for my situation is from a group in California that helps inmates who have been the victims of sexual misconduct behind bars. I felt like there was no way to get any help. I felt like these incidents would go unnoticed. Just Detention has helped me greatly but still I have dreams, I still get sick when I see Ruquet or Beitman & my anxiety & depression are through the roof. I don't trust anyone in authority in this prison.

26. I have in Lt. Smith's decision to my grievances from 12·5·11 & 12·9·11 Ofc. Mericonda's statement that she put my first grievance in the request box herself on A·Block. When I asked her if she read it like I asked her to, her exact words were "yes I read it, and there are alot of questions I could ask you but I'm not touching it." (This conversation took place on 11·22·11 on the tier of A·Block @ cell A·2·14)

27. There has been no recognition of my situation other than decisions to my grievances & appeals ~~other than~~ as denials. They do not respond to my request slips of me asking why there is no Sexual Harassment Policy in this prison. I've written grievances to & ~~against~~ against the Warden, Dominick Derose & the Policy Compliance Officer, Lt. Tim Good. Noone has responded & it's been almost two months. I'm afraid to put anymore in on the issue because I don't want administration to penalize me & say I'm abusing the grievance system. On the back of the inmate handbook, the last paragraph right above the Warden's signature & the date of June 23·04 it states: There shall be no reprisals against any inmate who files a grievance; however abuse of the grievance system shall be cause for disciplinary action. Any deliberate falsification of information

6.

duded in a grievance shall be interpreted as abuse."

. I will now go place to place in the handbook & point out the fact that it only states how inmates can be penalized for action & certain conducts but no talk about how staff should be reported if they commit them. And again nowhere in this handbook is there any mention g sexual harassment policy, even to guide an inmate as a victim @ the hands of ~~another inmate or slave~~ a staff member.

. Page-3 paragraph 6: Inmates shall not engage in any sexual behavior. Such actions shall be treated as a misconduct and/or violation of the a. Any inmate molested, threatened, or attacked by another inmate (s) is advised to report the incident immediately to a staff member. A ll report will be made & appropriate action taken. Officer Mariconda was made aware of my situation & she put my slip into the request box. 1-22-11) I had to write two more on 12-5-11 & 12-9-11 before Lt. Smith responded to me 3 days shy of a month later.

. Page-4 paragraph 2: Inmates shall address All personnel, both security & non-security, with courtesy & respect, using appropriate title (Warden, ptain, C.O. etc) Sir, Ma'am or miss are also permissable. The use of profane, vulgar, demeaning or obscene and/or abusive language is prohibite e above language toward any inmate, officer, or other staff member will result in disciplinary action. Threating language toward any aff member shall result in disciplinary action and/or criminal prosecution.

."This speaks of criminal prosecution & disciplinary action being taken for the use of abusive & offensive language but where is the disci- inary action that should have been taken against Herbert Ruquet? He threatened me & used profane, vulgar & demeaning language towa- (above) ls me. It clearly states "the ~~abusive~~ language toward any inmate, officer or other staff will result in disciplinary action." Detective Jallborn told me that the inmates he interviewed admitted in using this type of language with Herbert Ruquet. So because I am ut of 10 of them that doesn't like it, he did nothing wrong? The prison is not sticking to it's own policy, Herbert Ruquet should have @ least en disciplined by the prison."

2. Page-7- paragraph 5: Any felony, or misdemeanor, or summary offense (including Aggravated Assault, Rape, fighting, kidnapping, Escape, Ethnic ntimidation, Theft, self-mutilation, etc.) Now this speaks about Ethnic Intimidation which administration never investigated correctly. How can you te the one that the grievance is written against? ask them if they did it? Noone in their right mind when their livlihood may be @ risk is gonna in up to it.

7

33. "And about the summary & misdemeanor offense Det. Wallborn told me he "only" saw ... when I spoke to Lt. Smith on 12·18·11 he told me that he probably would not have footage of the days in question. He also told me that he would have CID called in to investigate, & I would hear something within a week. Had Lt. Smith ordered the tapes to be saved just on the 18th of Dec, he would have footage from the 18th of November. In Lt. Smith's decision to my grievances from the 5th & 9th of Dec, he does not even approach the possibility of video footage. He says nothing about it. He says why he couldn't interview Michael Gilmore but not whether he interviewed my former cellie, Stendell Baysden"

34. "I appeal his decision which of course was the first in a long line of denials of my grievances because of a lack of merit. "

35. "I wrote the D.A.'s Office on 1·26·12 & was very respectful in expressing my concern over charges being filed against Herbert Runquet. I explained my situation & then went into the definition of charge 2709 which is Harassment. I could not find a charge of Sexual Harassment but, plain Harassment suited my case. I wrote the whole description of the charge & Herbert Runquet's actions fit the offense graded not only as a summary offense but as a misdemeanor also. "

36. Page-7- paragraph b: <u>Inappropriate behavior (actions or abusive language)</u> and/or harassment toward staff or official visitors. This misconduct charge is one-sided as more than 95% of the rest of them. It only says & obviously means that this can only be done to DCP officials but in no way does it speak of inmates & how we are to report or respond to this happening to us.

37. Page-8- under Level I: No 4. Threatening another person with bodily harm or with any offense against his person, family or property. Herbert Runquet threatened to rape me on 11·22·11 & also told me "don't do the wrong thing" immediately after, but yet again there are no instructions on how to report this type of behavior or who I can confide in.

38. All of these charges are misconducts that are addressed as being solely committable by inmates. This is shown & proven by the penalties one faces for violations of prison regulation from the bottom half of page -9- to the top half of page -10-. Clearly in the eyes of (for the sake of not assuming anyone's standpoint) the inmate handbook, these misconducts contained which can only be committed by an inmate. The penalties are based around losing "Good Time" off of their sentence or restriction to disciplinary housing. "

39. "I have grieved all concerns contained within this complaint & the only responses I've received are of administration contradicting each

9

her. In Lt. Smith's initial decision dated 12-26-11 he tells me how he has interviewed 4 C.O.'s & myself & the reason he hasn't interviewed Michael Gilmore (stating that he was currently housed @ the DCWEC) He never interviewed my cellie Shandall Royster. With his final statement being the same as everyone else on every decision I've reached "I find it without merit." But he never stated anything about whether or not he saved or even @ least watched the tapes.

1. "So I appeal Jeffry T. Hask's decision on 1-12-12 & receive a response from Lt. Good saying how he spoke with Herbert Ruquet, John Beitman, John Beitman & then me. When he & I spoke he tells me how if Lt. Smith didn't order for the tapes to be saved, there probably would be no foot- p. He shows me the letter I wrote to CID offices prior & just tells me that "things don't move that fast around here." He tells me in the cision how Herbert Ruquet thought "the matter was closed." And how he will refer the matter to CID because of the nature of my allegations. And of course again he dismisses my appeal as "it having no merit."

. "On 2-12-12 I file a grievance against Lt. Smith pertaining to his neglect in conducting a satisfactory investigation of my so-called alleg- ions. I explained how Lt. Good said it was up to Lt. Smith to order the tapes to be saved. How he only spoke to C.O.'s & myself. How he took 26 ys to answer the 3rd grievance. His actions were completely irresponsible concerning this matter."

. "I have responded to Jeffrey T. Hask's decisions to my 1-12-12 & 1-17-12 grievances, saying how they say "file records were pulled & thoroughly viewed" & ask why he says that once CID is called into a matter, DCP does not conduct a parallel investigation. I am then pushed off by J.T. ate by him telling me I should direct any further questions to CID & how they have nothing else to do with it."

. "On 2-17-12 I file a grievance on Dominick Derose asking why this institution has no Sexual Harassment Policy. The current date is 4-12-12 & I've yet get a response from anyone concerning a sexual harassment policy. On 2-22-12 I file a similar grievance on the PCO Tim Goad for the same reason. ask if there is someone I can speak to about my feelings & how hard it is trying to cope without any counseling. I ask for any help he can er, even just someone to talk to. But to date no response."

4. "On 3-16-12 I get a decision from Lt. Corrazo telling me how he claims my "alleged harassment claims" have been investigated severa mes. He then goes to bring me new information into the mix when he says "Lt. Smith reviewed the video evidence in question & could not find anyt- g to support this inmate's claims." Of course I appeal this immediately & point out the fact that now we have a problem. How could it

<u>9</u>

review video & come to the conclusion that there was nothing to support my claim? Is he speaking of the video Lt. Smith, Lt Good or maybe J.T. Haske told CID didn't exist? They've told me out of their mouths that this video didn't exist. The video has not been refered to until Lt. Cornazzo said Lt. Smith reviewed them. Shouldn't these tapes have been given to Det. Wallborn to watch & investigate to make the decision if they contained behavior?

45. "The reason Det. Wallborn told me the D.A.'s office was not pressing charges was because there was not enough evidence. He then goes on to tell me how he had a murder he was investigating @ that time in Skelton. How he knows the person of interest was guilty, but the D.A. wouldn't press charges for the lack of evidence. So again I bring up the question why weren't the tapes given to the D.A.'s office (Det. Wallborn) to review? I appealed Lt. Cornazzo's decision on 3·16·12."

46. "On 3·26·12 I filed another grievance to the Full Prison Board asking had they received my initial appeal. I received the decision from Atty. Lavery on 3·27·12 & appealed that immediately."

47. "I also receive a decision from J.T. Haske on 4·2·12 telling me how the tapes were not saved "because it did not show anything that would support my claim." He then goes on to say "there is no audio component to the systems video recordings." I never questioned any audio, so why was it brought up?"

48. "I file another grievance pertaining to the prison not having a S.H. policy again on 4·17·12 & I filed that on 3·26·12. I appealed Lavery's decision on 3·25·12 & I am @ the final stage of the prison's grievance procedure. I explained how I do not agree with DCP's or CID's investigation. I put the definition of sexual harassment, sexual assault, quid-pro-quo which is latin for "this for that", sexual exploitation, & hostile environment harassment which I am a victim of."

49. "I sent out two more copies of my grievances against Dominick Derose & Tim Good pertaining to there not being a S.H. policy in DCP on 4·19·12 along with another inquiry about whether or not anyone was going to acknowledge any of them @ all, I receive a memo from Dominick Derose dated 4·26·12 telling me how there is a policy in place contained in section 1.3.1 of the Employee Handbook which governs the behavior of correctional officers @ DCP. He then goes on to tell me how CID has "found no basis to credit your allegations," & how the matter has been disposed of fully through the grievance process."

10

l. "He finally goes on to say that my "correspondance is referencing difficulties that you are experiencing with your incarceration experience, ase submit a request slip to medical in accordance with the inmate handbook." My correspondance does not reference difficulties it I am experiencing with my incarceration experience, it references difficulties that I am experiencing due to being sexually harass & assaulted, being a victim of hostile environment harassment & of sexual exploitation. I have constantly asked for help from this institution & or I get no response or I get answers to questions I never asked. "

"On either 4·19·12 or 4·20·12 Jill brings me a packet of papers containing the final decision to my sexual harassment grievance from County Solicitor. The packet contained all documentation from the beginning of the situation. The correspondance between myself & administration is with correspondance amongst themselves."

.. "On 4·26·12 on of the rare mornings that I went back to sleep after breakfast, I get awakened by a knock on my cell door from l. She has a huge smile on her face as she asks me if I still have the packet she gave me the week before. She tells me she erred in giving o me & asks for it back. As i'm trying to understand everything I notice another two people, Offi. Ford Unez & Jenna Tomasko the counselor & n I notice that Ofc. Unez has his handcuffs out. I comply & give her the packet out of fear of what may happen if I don't. She then tells . that she would return anything to me that I am supposed to have. But as they walk away I realize that i've made a huge mistake cause it contained everything."

.. "I immediately file a grievance stating how upset I am about my property being taken from me & how threatened I felt by Ei Unez having his cuffs out. I ask why did Jill have two other people there if it was just a mistake? She's always came my cell alone for the past 5 months, so what was so different that time? I put my grievance in the box to be picked up on the 27th."

f. "Now when I originally woke up on the morning of 4·26·12 around 4am I couldn't catch my breath, my chest hurt & I couldn't stop self from almost falling off the bed. I had had a dream about the thing I fear the most in DCP which would be for me to see Ofc. aguet in the bubble working my block. I had to walk down the hallway past the bubble somewhere & as soon as he saw me he started naring me. I couldn't get away from him & I couldn't breath. Before I know it everything went black, I woke up on the edge of y bed. Eventually I calmed down but stayed awake pacing my cell until trays came. I was scared to go back to sleep.

11

55. "When we get to law library the librarian, Tom has some copies of case law that I requested pertaining to a case that Frank J. Lavery Jr. Esquire the Prison Board Solicitor referred me to pertaining to the Iskamic lawsuit that he tells me has already been decided interor of the prison. I bring this up because Tom has never in the four months (@ that time) given me a wrong case. The one he gave me was a medical case. The caption was the same, but it was clearly the wrong case because the Warden in that case's first name was Dominique as opposed to the Warden of DCP who's is Dominick. He has been working @ DCP for 10 plus years & expects me to believe that he didn't notice the difference in the two first names, Let alone the head of the medical dept. That sent Flags up instantly."

56. "I will now show from the first time that Dr. Martin assessed me & put me on medication due to the problems I immediately started having right after I reported this situation to administration & checked into Protective Custody."

57. "When I first came into the prison during my intake I distinctly told the nurse that I did not want the medication I was taking before & that I felt good & fine. Almost immediately after I came forward with the situation involving Ofc. Ruquet. I started getting depressed again. I started hearing voices again telling me that the things Ofc. Ruquet said & did to me were my fault, They angrily blame everything on me. Dr. Martin started me on 100mg. of Siniquine & 40mg of Selexa. They didn't work well @ all. The Selexa was for my anxiety & the Siniquine was to help me with my depression & insomnia. The Siniquine made me shake uncontrollably & caused my mouth to spasm while talking. It did nothing to take my guilt away nor to calm my situation. I barely slept & just paced the cell all day & well into the night. I kept having this recurring dream when I did sleep of my dead uncle punching me in my chest & face saying It's my fault. This is everything I went through from 11·22·11 to 1·4·12.

58. "On 1·6·12 I get called down to sickline @ 8:54 a.m.. The nurse asked me what I was there for, I told her that I did not fill out to see her. I filled out to see Dr. Martin to ask him why I haven't received any of my request slips back from him. The nurse informs me that she is not authorized to give any request slips back & that she would need permission from the warden to do so. She asked me what I wanted them for & I told her my records. Then Ofc. Manwill chimed in & started telling me that the nurses don't ever get the request slips when someone sees the psych. They pushed it off onto Dr. Martin & then tell me to speak to Jill. When I speak to her she tells me that it would be a violation of my Hippa laws for her to have anything to do with my medical records."

59. "@ some time that I for some reason do not have documented, Dr. Martin raised my mg. on my Siniquine to 150mg. because it was

12



impossible to sleep or even cope with my situation. The Selexa didn't make much of a difference either but it did help some. I was like to relax @ some points throughout the day. But once I began seeing Ofc. Ruquet on the way to visits it became almost impossible to cope all over again."

"1.11.12 - I was called down to see Dr. Martin @ which time I told him about my problems that I was having due to me seeing Ruquet & how the medicine became useless. He switched me from 150 mg. of Siriquine to 100 mg of Elevil. I maintained 40 mg. of Selexa. He asked me to pick a number & I said 6. He then read Psalms 6 to me & told me that God wanted me to hear that. I also told him about the nightmares I continuously have of Ruquet."

1.31.12 - "Dr. Martin comes to my cell to check on me about how i'm doing with the Elevil. I inform him that I am still having very bad nightmares so he ups it to 150 mg."

"2.28.12 - "I choked very badly because of my medicine tonight so I stopped taking it because this is the second time it's happened. The policy of the prison is to crush all narcotics. I put a slip in to talk to Dr. Martin about the form of the pill. Between 2.29.12 - 3.1.12 I put in two more slips to Dr. Martin asking if he can leave my meds whole so I can get them closer."

"By 3.9.12 the previous week has been the most unbearable week of my entire bid. I have been having vivid, horrifying dreams paired with some sleepless nights for fear of the dreams. Constant dreams & nightmares & because of these i'm fighting my sleep to wake right back up. Still no response from Dr. Martin to any of the 3 slips I have put in to be taken completely off of my meds."

1.3.12.12 - "Today Dr. Martin calls me down to finally answer my 4 request slips & by now i've just given in to them because I couldn't take anymore. It was either choke for a few or be terrified all night."

5.5.17.12 "I go to see Dr. Martin & inform him of the dreams that I continuously have of Ruquet & how they never fully go away. He then asks me what am I stressing about. I tell him about my parole situation & the fact that my wife has distanced herself from me since I told her what has happened to me & then wrote me a letter asking if i've ever had any kind of homosexual contact or been the victim of some kind of molestation. She eventually stops writing & sending money & then the letter asking for a divorce. He takes me off of the Selexa, which I

<u>13</u>

never resumed taking since 2.28.12 because he told me that 40 mg is the highest dosage I could take because any higher would affect my heart. He then puts me on Valium, 2.5 mg."

66. 5.22.12 - "I am now in the hole for a disagreement with C.O. Timothy miller. I am being housed on A-Block. A & B share the same control booth, & second shift, Ruquet works the control booth. When I see him I get very nauseus, very afraid & anxious. I am in cell A·1·1 which is the closest cell to him. All I do the whole 2nd shift is pace & pray. I put a slip in to talk to Dr. martin immediately."

67. 5.25.12 - "I get called down to medical @ 8:45am to talk to some guy who just puts me on the list to talk to Dr. martin. I tell him about everything & he says that he will talk to D.W. Nichols to get me moved off of A-Block."

68. 5.29.12 or 5.30.12 - "I get called down to see Dr. martin. He asks me what's going on? I tell him everything. I express my fear of being on A-Block with Ruquet. He asks the other guy (mr. Zugg) about what's going on with me & whether or not he got a response from D.W. Nichols. He informs Dr. martin that they have a 10:00 am meeting with D.W. Nichols & that they can bring it up again to her then. Dr. martin then tells me that he doesn't wanna just up my medication if he can get me moved. Says he'll talk to D.W. Nichols & will check on me within two weeks."

69. "As of 6.14.12 today, I have not been moved yet. This would bring the court completely up to date concerning my medication & all of the changes I've been going thru since this began."

70. "5.10.12 - marks the second time Tom (law Librarian) has come back to me without the cases I've asked him for when the cases pertaining to sexual harassment or islaamic lawsuits against DCP. This time he tells me that he almost forgot my requests altogether but he managed to get all 3 specific cases I requested but just forgot my other requests. The date on that slip is 5.8.12."

71. 5.21.12 - " as of today I have not received a response from the County Solicitor Joseph A. Curdillo III Esquire Chief solicitor. When I appealed Frank J. Lavery's decision concerning Sexual Harassment on 3.23.12. Till delivered that entire packet to me on either 4.19.12 or 4.2012. Now I appealed Frank J. Lavery's decision concerning the "video evidence" on 4.18.12 & it is now 6.5.12 & I still have nothing &

72. "I initially filed a grievance against Lt. Smith for his negligence pertaining to him seeing the footage from @ least 12.18.2011 when he acknowle-

4

ed my grievances against Ofc. Reitman & Ofc. Ruquet on 2·2·12. when I was seen by Lt. Good on 1·5·12 I was told by him "If Lt. Th didn't pull the tapes on these days there would probably be no footage."

3. "This statement along with Lt. Smith's comment to me on 12·15·11 of him saying "the reason I am addressing this is so you cannot say & Lt. Smith didn't do anything." & then him asking me what I wanted done & I responded by saying "I want Ruquet & Reitman held accountable" were my reasons for me filing the grievance against him for his negligence. He could've saved the tapes @ least from the 10 of Dec.! it would've showed from 11·15·12 to 12·15·11, which included Ofc. Ruquet coming out of the control booth on 11·22·11 & into my II where he threatened me with rape & then told me "don't do the wrong thing."

4. "I have appealed all decisions from Lt. Camazzo to Frank J. Lavery's but now I get nothing from the County Solicitors, my main issn for pursuing this grievance is because from the beginning I have been told that the tapes were erased automatically by the prison's due system. I was told by Det. Wellborn from CID the reason they couldn't press charges was due to lack of evidence."

5. "But when I got Lt. Camazzo's decision dated 2·29·12 which says "Lt. Smith reviewed the video in question & could not find anyth-; to support this inmate's claim." & I appeal that & that gets answered by Commissioner Hask where he says "Footage from the prison's two camera system was not saved because it did not show anything that would support your claim. In addition, there is no audi component to the system's video recordings." & I appeal that which gets answered by Atty. Lavery where he says "The Shift Command ; are trained & experienced in the review of videotape. Here a Senior Shift Commander reviewed the video & determined that there was reason to preserve it. @ that point, the video would be recycled in normal course & was not available for further review. while may be your position that the tape should have been preserved, the fact remains that there is no evidence that it contained thing of value to support your contentions. Again, there is no audio component to the video & it's value in connection with s @ best is extremely marginal." Of course I appeal this decision & here I wait."

6. "Why would Lt. Camazzo have to be the first to say that Lt. Smith did watch the tapes that he's told CID were erased from the :ginning. The only reason CID was initially called in was because I wrote them personally, but even then before they responded, they sen y letter back into the prison which Lt. Good had in his possession when he interviewed me on 1·5·12."

<u>15</u>

77. "The prison has completely picked every grievance apart that I have filed, selected the things they wanted or had an answer to & left the ~~the~~ ~~the~~ other issues to the wayside. I have stayed on task as much as possible."

78. "On 5·24·12 I get into a dispute with ofc. miller in which he completely flies off the handle @ me & starts cursing @ me telling me he will not allow me to trade my tray with another inmate. I bypass him because now I just wanna get my tray. I push my communication button in my cell which is connected to the control booth, That ofc. asks ofc. miller "what did he hit his button for?" He tells him his version & the ofc. in the control booth threatens me by saying "tell him he's beat & if he hits his button again I'll be in there to beat on him." I informed miller that I didn't know that he doesn't allow inmates to trade trays & asked him could he leave my tray on the block & out of his mouth he told me "you're beat!" I asked an inmate in the dayroom to go to the box & ask him his name & miller responded with " tell him fuck him, dont worry about my name!"

79. "I immediately write both officers up. @ 8:00am ofc. miller comes onto the block & I overhear him telling another inmate in 6 cell " I just worked 12 hrs., my tolerance is low." as he walked past my cell I stopped him & asked him his name. He walked to my door & said "Timothy miller."

80. "By 9:18am I was removed from group & informed that I was going to the hole. I had been written up. I get taken to the hole by the two officers, I had the dispute with, the handcuffs were extremely tight. When we get up front Sgt. Bańk instructs me to drop my bag which probably weighed 20-35 lbs. that I was made to carry in my right hand, Sgt. Bańk then instructs the officer to remove my cuffs & asks me if I'm alright, I say "no"& he says "I know how intimidating those cuffs can be." I instantly realize that he's referencing when I wrote Jill, ofc. Unez, & Jenny up. He says something else & again references how intimidating the handcuffs can be."

81. "When I get to A·Block which is where I am currently being held without having been given a disciplinary hearing concerning my write-up yet. I run into michael Gilmore (DCP# 54961) being brought back into the prison. He tells the inmate I send to ask if CID came to tell him yes. But when he comes to get into the shower I ask him did he talk to CID & he says "yeah & then asks me "why would you live on dude? He's just a cool dude." This is coming from the same guy who took a shower butt naked the night Ruquet asked me to get in naked. "You a rat, why would you put me in that? Don't let me catch you it's gon' be problems."

**6**



4. "When moves are made Gilmore comes to A.V. He comes to my cell & asks "what happened? Did duck do something to you?" I just ok my head & said "there's nothing to talk about."

5. "I spoke to Mary (Counselor of A Block) about the grievance Ofc. Maricinita put in the request box on 11·22·11. I asked her if I mightine remembered forwarding it to a major. She said she didn't recall but would look into it. She then said that someone may have filled for her."

6. "I ran into an inmate that I was on B. Block with before & his cellie told me how he witnessed Ruquet commenting on how long, big, thick his penis was as he caught the inmate going to the bathroom. He was moved before I could ask him if he would give me a declaration."

7. 5·22·12 - "Second shift has started & Ofc. Martinez (the one that was working F on 11·22·11 & the one who asked me if I was sure Rug- t was coming @ me) is the block ofc. for A & Ruquet is working the control booth for both A & B blocks. I get instantly nauseus anxious. My stomach hurts & I get a feeling of fear that lasts all night."

8. 5·23·12 - "The two C.O.'s that are working 2nd. shift chased a cockroach down the tier stepping in either direction of it so it had nowhere to go except my cell. I yelled & expressed my fear of bugs but they didn't stop. I looked under my door & it was there climbing in. I kicked the door & told Ofc. Savage to get it away from my cell. They laughed & joked about it. Savage finally picked it up in some tissue & threw it in the trash can but it wasn't dead. I stayed up all night until breakfast, @ which time the cockroach came back into my cell, I stepped on it & killed it."

9. "Before the two C.O. "Savage & Blanch got off that night I noticed they kept watching me in my cell & laughing secretively. I saw Savage @ the blk drawing on a piece of brown tissue, A few minutes later I looked & the piece of tissue was on the floor in my cell, it had a piece of pe on it & was folded. I kicked it out of my cell & asked the C.O. what was on it & he said "we made a cockroach for you." as he laughed & walked away

10. 5·26·12 - "Ofc. Savage worked second shift & came to my cell to talk to my cellie because as I understand it they know each other on the streets. (an C. Scott) The first thing he said to him was "do you like cockroaches?" Scott said "no, I saw like 4 up @ shakedown." Savage then said yeah, on Wednesday we chased one in on your cellie, he was flippin' out, it was funny. "Savage then said he would try it again tonight not knowing the

17

I heard him & my cellie said "that'll be cool."

89. "I got tormented by Savage & Blauch on Wednesday Banquet worked on 5·22·12 & 5·24·12 & kept staring @ my cell, I had to deal with Sgt. Bonin up shakedown on my way to the hole on 5·2·12 & the guard I was arguing with along with the one that threatened to beat on me. Along with Savage continuously walking past my cell for his whole shift staring in @ me while I was trying to get some sleep. Everytime I heard him I was afraid he had thrown a cockroach in on me. He comes to the door while my cellie & I were talking, I walked away from the door. He looked @ me & smiled @ me & said "are you mad @ me?" I responded by saying "I'm a grown man dog I don't get mad." He then went on to ask me "is it the cockroach thing?" I just sat on my bed & waited until he left to start talking again. My cellie said "He must know New York." I said "They all know what's going on."

90. 5·29·12· "I find out that I should again question whether the PFA's I attempted to file ever made it out of the building because for 1. I never got a response from Steven Farina (Prothonotary-Dauphin County) on whether or not he filed my PFA's but I also knew he didn't because you cannot retain your job in Dauphin County Prison with a PFA lodged against you. It is automatic grounds for termination. (Upon knowledge & belief) so were they rerouted intentionally for the sake of Beitman & Banquet's jobs? Also the jail would've known that I was attempting to file them because Tom ran off the copies.

91. "As of 6·1·12 I have still not been moved after what I've been told by the psychiatrist, two attempts directed to D.O. Nichols. Ofc. Banquet worked the 29, 30 & 31 of May. But from the stories my cellie has told me about P·3 & shakedown which are my only alternatives as a P.C. lockin I have no choice but to stay quiet because if I go to either of those places I will be deprived of either of my belongings or my sanity. Then he & I have been arguing all day, when I put my washrag in for laundry I mistakenly gave him the clean one when he never had one to send out. He told me I could not have my washrag back so I attempted to go through his laundry bag after he told me I could, to look for it. He grabbed the bag & began to threaten to "fuck him up" in front of Ofc. Pettigrew who came to see what the commotion was. I later found out that this inmate has a violent jail record for assaults on other inmates & is in prison for a number of attempted homicides & aggravated assaults."

92. "I was questioned by an inmate that was running when he said "When they start putting a white man & a blackman in the cell together?" It is common knowledge throughout the prison by staff & inmates alike that the prisoner population is racially segregated. Mr. Scott was written up & moved out of my cell but the ofc. & counselor who he went in front of for his write-up threw the write up out because "we don't

5

orry about Mrs. P's write-ups." is what they told him. I overheard him telling another inmate this @ rec one night. Within a few days I was let out of the hole. I believe I have proven that him & I being assigned the same cell was a set up by administration."

., "5·31·12 I got the decision back from my grievance I put in on 4·26·12 concerning Jill Cuffaro taking my paperwork & it was closed, cased "without merit" so I appealed it & sent it out on Sunday night from A·Block."

., "I filed for the 3rd time my grievances on Dominick Derose & Tim Good from A·Block about the absence of a sexual Harassment key in DCP."

., "I filed a grievance concerning the fact the prison has not answered my grievance dated 4·22·12 questioning what happened to y initial grievance of sexual Harassment placed in the request box on A·Block on 11·22·11. I put this in Mrs. P's hands around 7am 6·6·12 to place in the request box on A·Block."

., "6·5·12 - 6·7·12 Ofc. Auquet again works A & B blocks control booth. I see him talking to C.O.'s then he'll see me in my door & begin staring @ ., From Tues,-Thurs, I never got any sleep. I stay up all night pacing."

., 6·17·12 - "I file my grievance against Sgt. Borik & put it in the request box on A·Block along with my grievance against Savage & Bar- , to be picked up on 6·18·12."

., 6·20·12 - 6·22·12 "I find out that (upon knowledge & belief) Ofc. Conners has been fired over a supposed incident of sexual misconduct with female inmate, where was the investigation from C.I.D? Conners is black, I am black, Auquet is white & Conners accuser is white. @ about 3·15 ., Ofc. Burkins comes to my cell (Q·3·3) & tells me that medical wants to see me, I get down there & Mr. Zugg (psych. asst.) asks me o am I doing & informs me that the Warden wants me to get counseling & whatever else I may need. He tells me that he isn't sure if they ll bring someone in from the streets or not. I told him that I didn't want to talk in front of the nurse, the C.O. & some other guy. He only sed the C.O. to leave. He kept cutting me off & gave the reason that he was about to go home for the day."

., 6·25·12 - "Mr. Robinson comes to see me about my slip I put in telling Dr. Martin that it was an emergency. I told him that

19

the voices I used to hear are back & are very angry. I also ask him to put me back on Navane which is for the voices. I also received a decision from Lt. Carrazzo pertaining to my appeal of my courtline decision which I will appeal & I also received a decision from the warden pertaining to his supposed sexual harassment policy which I will appeal also."

100. 6·29·12 or 6·30·12 "Dr. Martin calls me down & I tell him about how bad the voices have gotten & how angry they are with me. He puts me back on Navane. He also confirms that I should be talking to a counselor soon."

101. 7·2·12 "I put separations in on Gilmore & Scott. Tim comes to my cell to tell me that he will be my counselor. He asks me would I want to talk privately & I tell him yeah. He says he'll come back when he has an officer. He comes a few hours later & pulls me out. We go out to an office where only he & I go. I explain the happenings from Nov. 20th to date. He tells me that it's nothing that I did to cause Requet to do what he did & his advice for me is to come out of p.c. & go to I. Block. I tell him maybe, but I have no intentions of doing so because I am still afraid."

102. 7·3·12 "I get another special tray with my name on it @ lunch & dinner. I sent my appeal out pertaining to Derose's decision about the sexual harassment policy along with my grievance against D.W. Nichols about not moving me off the A. block. I put a slip in about the tray. I got my decision back from Curcillo only concerning the Noble Oubraan & Video evidence. He tells me how Lt. Smith did not err in erasing the tapes. How there was nothing to support my allegations, & that he in no way did anything go wrong."

## V   Exhaustion Of Legal Remedies

103. Plaintiff Equan A. Jones used the prisoner grievance procedure available @ Dauphin County Prison to try & solve the problem. On 11·22·11 plaintiff Equan A. Jones presented the facts relating to this complaint. On 1·12·12 plaintiff Equan A. Jones was sent a response saying that the grievance had been denied. On 1·12·12 he appealed the denial of the grievance.

## VI   Legal Claims

104. Plaintiff realleges & incorporates by reference paragraphs 1-103

20

ii. The sexual harassment, sexual assault, sexual misconduct, deliberate indifference to mental, emotional & physical health & safety, threats rape, culpable state of mind, failure to train employees, administration being grossly negligent, labeling me a snitch, their failure to test & lack of a sexual harassment policy & placing me on a block with Herbert Banquet for 30 days even after I alerted the psychiatrist is assistent, violated plaintiff Equan A. Jones' rights & constituted cruel & unusual punishment under the 8th Amendment to the United tes Constitution.

b. The erasing of the video footage before CID got a chance to view it & placing plaintiff Equan A. Jones in the hole & depriving him of s personal belongings without a disciplinary hearing for 18 days, & placing me on blocks where I cannot access the law library & still owing Herbert Banquet & I to cross paths which has put my mental & emotional health @ risk violated Equan A. Jones' rights & cons- ated a denial of my due process rights & equal protection rights under the 14th Amendment to the United States Constitution.

E. The retaliation of Lt. Tim Good & Caseworker Jill Cuffaro @ my disciplinary hearing, the fact that I have ~~already sued to speak~~ filed grievan s against Jill Cuffaro, by giving me 60 days in the hole & retaliating against me for filing grievances & then denying my parole supposedly ue to my address. My write up was serious enough to warrant 60 days in the hole but wouldn't stop my parole? The excuse that the arole office didn't want my address is an attempt to cover up the obvious retaliation of the prison & violates my rights & constituted an bridgment of my freedom of speech & a denial for me to petition the government for a redress of grievances under the 1st Amendment the United States Constitution.

8. The plaintiff has no plain, adequate or complete remedy @ law to redress the wrongs described herein. Plaintiff has been & will continu be irreparably injured by the conduct of the defendants unless the court grants the declaratory & injunctive relief which plaintiff seeks.

## VII Prayer for Relief

WHEREFORE, Plaintiff respectfully prays that this court enter judgment granting plaintiff:

9. A declaration that the acts & omissions described herein violated plaintiff's rights under the Constitution & laws of the United tates.

21

110. A permanent injunction ordering defendants to adopt a sexual harassment policy similar or equal to that of the District of Columbia. To train all staff in the manner explained in the case 93 F. 3d 910 Women Prisoners of District of Columbia Dept. of Corrections v. District of Columbia. To make the grievance proadures & the manner in which all grivances are responded to, more efficient. To have an outside source put together as the primary responder to the complaints of any sexual misconduct. And to keep all complaints private. And if it becomes public & the Plaintiff's name is divulged then the staff member that violates this policy should be harshly reprimanded.

111. Compensatory damages in the amount of #75,000 against each defendant, jointly & severally.

112. Punitive damages in the amount of #175,000 against each defendant.

113. A jury trial on all issues triable by a jury.

114. Plaintiff's costs in this suit

115. Any additional relief this court deems, just, proper, & equitable.

Dated: 9·7·12

     Respectfully Submitted,


Equan Anwar Jones

Dauphin County Prison

501 mall road

Harrisburg, Pennsylvania 17111


<u>Verification</u>

1

I have read the foregoing complaint & hereby verify that the matters alleged therein are true, except as to matters alleged on information and belief, and as to those, I believe them to be true. I certify under penalty of perjury that the foregoing is true & correct. Executed @ Harrisburg, Pennsylvania on 8·22·12

Equan A. Jones

Eq—A. J———

26

2·5·12

Dear Ms. Mullett,

I hope I don't offend you with the Ms. if you are married but obviously I wouldn't know. I am very appreciative of your help. I was beginning to think the Prison was intercepting my mail. Now I am in understanding of the criteria that must be met to bring a sexual harassment claim and I believe that in my case it has been met.

I have almost written the whole JLH out because they could have moved the brother off of the block @ any time and I would have been @ a great loss. Insha-Allah (with the will of God) I will be able to bring my case post the summary judgment phase and I can hand the baton off to you guys while also still doing my own homework.

I have a serious but not impossible question to ask, but I will explain my reasoning first. I have been in a lot of different situations in my life and have worn a lot of different hats in the occupation field. But I have not been happy; reading the JLH and understanding the major changes a pen and a little dedication can make. Is it possible for one with a lengthy criminal record to gain the civil side as an attorney after obvious completion of school?

I am very eager to learn and have always been one to help others. There are a lot of things going on in DCP that need changing. I know that I may be the one to do so Insha-Allah, so please tell me something good. To answer your question; yes I am planning on filing pro se to actually see if I have even just one legal bone in my body. But of course I will consult you guys @ PaILP first to make sure all of my ducks in a row.

What I'm hoping is to come home and get some direction from you guys to becoming a civil Attorney or @ least

27

very good and valued Legal Assistant such as yourself.

Truly,

Equan A. Jones

DCP#: 73716

Date: 2·5·12



**PENNSYLVANIA INSTITUTIONAL LAW PROJECT**
Angus R. Love, Esq., Executive Director

March 19, 2012

Equan Jones
#73716
**Dauphin County Prison**
501 Mall Road
Harrisburg, PA 17111-1299

Dear Mr. Jones:

I am in receipt of your recent letter dated February 5th 2012 and am responding accordingly. I am glad the previous materials I have sent were useful. You wrote in your letter that you are planning on moving forward with your case *pro se*, so I am including with this letter the form you would need to fill out as well as some additional information on how to file and prepare your case. Just to be clear, even if your case does survive the summary judgment phase I can't guarantee that PAILP will be able to take it, only that we would reevaluate your case at that time.

You also ask about the possibility of people with criminal records becoming lawyers. My understanding is that it is difficult, but not necessarily impossible. To be admitted to the Bar in Pennsylvania you must prove that you are of "good character and fitness," and a past criminal record makes this more difficult. If you have questions about whether your specific situation would prevent you from becoming a lawyer you can write to the Board of Law examiners at 601 Commonwealth Ave., Suite 3600, P.O Box 62535, Harrisburg, PA 17106-2535. Another option you could consider upon your release is becoming a paralegal. That way you could still work in the legal field but your past criminal record may be less of an issue.

I hope that the enclosed information is helpful and I wish you the best of luck moving forward.

Sincerely,

Layne Mullett
Legal Assistant



USPS FIRST-CLASS FOREVER

SEP 2012 PM

United States District Court
Middle District Of Pennsylvania
William J. Nealon Federal Bldg, ¢ U.S.
Courthouse
235 North Washington Ave,
P.O. Box 1148
Scranton, PA. 18501-1148

NAME Eugenia Jons
D.C.P. #_____
DAUPHIN COUNTY PRISON
501 MALL ROAD
HARRISBURG, PA., 17111